IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:08-CT-3105-D

JAMES E. RODGERS,                          )
                                           )
                    Plaintiff,             )
                                           )
          v.                               )          **ORDER**
                                           )
KENT HILL, et al.,                         )
                                           )
                    Defendants.            )

On August 14, 2008, James E. Rodgers ("Rodgers" or "plaintiff"), a state inmate and

habitual drug dealer, filed this action under 42 U.S.C. § 1983. Rodgers sues Kent Hill ("Hill"),

David Richards ("Richards"), Russell Davenport ("Davenport"), and Clayton Miller ("Miller")

(collectively "defendants") in their official and individual capacities. Hill, Richards, and Davenport

are deputies with the Beaufort County Sheriff's Office, and Miller is a former Beaufort County

Sheriff's Office deputy. Rodgers alleges that defendants used excessive force during his arrest on

December 21, 2005, and seeks damages. Defendants deny using excessive force during the arrest

and assert the defense of qualified immunity.

On October 19, 2009, defendants filed a motion for summary judgment [D.E. 30] with a

supporting memorandum [D.E. 31] and exhibits [D.E. 31, 40, 42, 44]. On October 20, 2009, the

court notified Rodgers about the motion for summary judgment, the consequences of failing to

respond, and the response deadline [D.E. 34]. See Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir.

1975) (per curiam). On November 30, 2009, Rodgers filed a memorandum in opposition [D.E. 43].

On December 17, 2009, defendants replied [D.E. 45]. On April 23, 2010, Rodgers filed a motion

to amend the complaint to name Beaufort County Sheriff Alan Jordan ("Jordan") as an additional

defendant [D.E. 46]. Defendants responded in opposition to the motion to amend [D.E. 47], and

Rodgers filed a request to continue defendants' motion for summary judgment or, in the alternative,

for an enlargement of time to respond [D.E. 48]. See Fed. R. Civ. P. 56(f), 6(b).

For the reasons explained below, the court denies plaintiff's request to continue defendants'

motion for summary judgment or to enlarge the time to respond [D.E. 48]. The court also grants

defendants' motion for summary judgment [D.E. 30], denies plaintiff's motion to amend the

complaint to add Sheriff Jordan as a defendant [D.E. 46], and denies plaintiff's attempt to assert a

new claim in his affidavit in response to defendants' motion for summary judgment.

I.

Before addressing defendants' motion for summary judgment, the court considers plaintiff's

Rule 56(f) request [D.E. 48]. See Fed. R. Civ. P. 56(f). Rodgers asks the court to deny or continue

defendants' motion for summary judgment until he has added Sheriff Jordan as a defendant and

obtained "medical records and other[] relevant information." See Pl.'s Rule 56(f) Aff. 5–8.

Rule 56(f) of the Federal Rules of Civil Procedure provides:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot
> present facts essential to justify its opposition, the court may:
>
>> (1) deny the motion;
>>
>> (2) order a continuance to enable affidavits to be obtained, depositions to be
>> taken, or other discovery to be undertaken; or
>>
>> (3) issue any other just order.

Fed. R. Civ. P. 56(f). Under Rule 56(f), a court may delay ruling on a motion for summary judgment

if the nonmoving party requires discovery to identify "facts essential to justify the party's

opposition." Crawford-El v. Britton, 523 U.S. 574, 599 n.20 (1998) (quotation omitted); Nader v.

2

Blair, 549 F.3d 953, 961–62 (4th Cir. 2008); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 n.2 (4th Cir. 2004).

Under Rule 56(f), a court may defer ruling on a motion for summary judgment if the non-movant demonstrates that he has not had sufficient time to present facts in opposition to the summary judgment motion. See, e.g., Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002). In analyzing a request under Rule 56(f), a court may consider whether the party has failed to pursue discovery diligently. See White, 375 F.3d at 295 n.2; Harrods Ltd., 302 F.3d at 245; Strag v. Bd. of Trs., 55 F.3d 943, 953–54 (4th Cir. 1995).

On August 14, 2008, Rodgers filed this action [D.E. 1], and on April 27, 2009, defendants denied plaintiff's allegations and asserted various affirmative defenses, including qualified immunity [D.E. 18]. The court has discretion to manage a case to ensure "that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." Crawford-El, 523 U.S. at 597–98; Lescs v. Martinsburg Police Dep't, 138 Fed. Appx. 562, 564 (4th Cir. 2005) (per curiam) (unpublished). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200 (2001), overruled on other grounds by Pearson v. Callahan, 129 S. Ct. 808 (2009). Moreover, the defense of qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation.'" Id. (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Indeed, "[t]he entitlement is an immunity from suit rather than a mere defense to liability." Mitchell, 472 U.S. at 526.

The court provided Rodgers ample time to engage in discovery, and Rodgers failed to pursue discovery diligently. Rather, on May 24, 2010, Rodgers filed interrogatories and a request for a production of documents, which he directed to Jordan, a non-party [D.E. 49]. Moreover, defendants

3

have produced Rodgers' medical records [D.E. 40-1, 40-2]. Rodgers offers no explanation for his failure to seek discovery from other defendants and has failed to show good cause for enlarging the time to respond to defendants' motion for summary judgment. See Fed. R. Civ. P. 56(f); White, 375 F.3d at 295 n.2; Strag, 55 F.3d at 953–54. Thus, the court denies Rodgers' request to continue defendants' motion for summary judgment or, in the alternative, to enlarge the time for his response [D.E. 48].

## II.

### A.

Defendants seek summary judgment [D.E. 30]. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed and quotation omitted).

In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for

4

summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

Rodgers claims that defendants used excessive force during his arrest on December 21, 2005. Compl. 1–5. That evening, Janice White (Rodgers' "lady friend") answered a call on Rodgers' cell phone from Lester Little. Id. at 4, 6. Little asked White to have Rodgers meet him at Cratch's Grocery Store ("Cratch's") off Highway 264 in Washington, North Carolina. Id. Rodgers knew Little from work and drug dealing and agreed to meet him. In fact, Little had purchased $1600.00 of crack cocaine from Rodgers earlier that day. Trial Tr. 54:13–57:3. Rodgers drove to Cratch's, and saw that Little was in his car. Compl. at 4, 6.

As Rodgers approached Little's car, Rodgers claims that an unmarked vehicle appeared, and individuals wearing civilian clothing "jumped out . . . screaming . . . pulling guns running towards [Rodgers'] vehicle so [he] made an attempt to leave." Id. at 4. Rodgers asserts that he was unaware that the individuals were with the Beaufort County Sheriff's Office. Id. Rodgers claims that Davenport and Miller opened his door, threw him to the ground, kicked and struck him, and covered his head with his hooded sweatshirt. Id. According to Rodgers, Hill and Richards then kicked and punched him. Id. Rodgers also asserts that Hill held a flashlight around his neck and started to choke him with it, while Davenport searched him. See id. at 4. Rodgers alleges that Hill then pushed the flashlight down his throat. Id. at 4, 7. Rodgers also claims that Hill inserted a firearm into his mouth, making it impossible for him to breathe. Id. Rodgers alleges that Hill threatened to shoot if he screamed. Id. Rodgers claims that someone ran out of Cratch's yelling at Hill to stop. Id. at 7. Rodgers also claims that defendants called him racially-derogatory names. Id. at 6–7. Rodgers denies resisting defendants or being aware of his pending arrest. Id. at 4, 6.

5

As a result of defendants' alleged excessive use of force, Rodgers claims that he sustained injuries to his right hip and back. Id. at 4, 7–8. Rodgers asserts that he now walks with a limp, experiences constant pain, and has difficulty sleeping. Id. Rodgers seeks $500,000.00 in damages from each defendant. Id. at 5, 8.

Defendants seek summary judgment and contend that they did not violate Rodgers' constitutional rights and are entitled to qualified immunity [D.E. 30]. In support, defendants rely on the affidavits of Captain Timothy McLawhorn [D.E. 31-1] ("McLawhorn Aff."), Investigator David Richards [D.E. 31-2] ("Richards Aff."), Investigator Kent Hill [D.E. 31-3] ("Hill Aff."), former Investigator Clayton Miller [D.E. 31-4] ("Miller Aff."), and Lieutenant Russell Davenport [D.E. 31-5] ("Davenport Aff."), plaintiff's medical records (which have been sealed) [D.E. 40-1, 40-2] ("Ex. 1," "Ex. 2 "), plaintiff's trial transcript from his 2007 criminal trial [D.E. 31-8, 31-9, 31-10, 31-11] ("Trial Tr."), plaintiff's (redacted) deposition [D.E. 42-1, 42-2, 42-3] ("Pl.'s Dep."), and the unpublished opinion of the North Carolina Court of Appeals affirming Rodgers' 2007 criminal conviction arising out of his arrest on December 21, 2005 [D.E. 31-16].

The North Carolina Court of Appeals summarized the events of December 21, 2005 as follows:

> On the afternoon of 21 December 2005, Lieutenant Russell Davenport (Lieutenant Davenport) of the Beaufort County Sheriff's Office equipped a confidential informant with an audio transmitter and $1,600.00 in cash and dispatched him to Cratch's Grocery with instructions to purchase an ounce and a half of cocaine from Mr. Little. Mr. Little met the informant at the store and took the money, saying that he would return with the cocaine. Mr. Little then drove down Highway 264 into Pitt County, where he turned onto a dirt road. Lieutenant Davenport stopped Mr. Little's vehicle on Highway 264 upon his return to Beaufort County. Mr. Little surrendered 42 grams of crack cocaine, identified [Rodgers] as his supplier, and agreed to attempt to buy an additional $40.00 worth of cocaine from him. After listening to Mr. Little and [Rodgers] arrange the transaction by telephone, officers wired Mr. Little with an audio device and sent him back to the Cratch's Grocery parking lot. [Rodgers] pulled

6

into the lot in a white Chevrolet Lumina, approached Mr. Little, and alluded to their earlier transaction. When Mr. Little told [Rodgers] that he had to "go get the money," the officers converged on the scene with their blue lights and sirens activated. [Rodgers] put his car into reverse and attempted to flee but collided with a truck driven by one of the police officers. [Rodgers] then drove toward the officers, striking one officer on the leg and forcing him onto the hood of the vehicle. With officers hanging from his car, [Rodgers] proceeded approximately twenty feet before colliding with another police vehicle. [Rodgers'] vehicle was searched after a police canine alerted to the presence of narcotics on the driver's side. Officers found twenty-one plastic baggies containing a total of 9.3 grams of crack cocaine in the vehicle.

State v. Rodgers, No. COA07-1179, 2008 WL 850640, at *3 (N.C. App. Apr. 1, 2008) (unpublished).[1]

Rodgers is a lifelong resident of Beaufort County, see Pl.'s Dep. 19:13–18, and a habitual drug dealer. Id. at 31:9–34:21.[2] The Beaufort County Sheriff's Office Narcotics Unit ("Narcotics Unit") knew Rodgers from drug investigations. Davenport Aff. ¶ 4; Pl.'s Dep. 66:10–67:9. On December 21, 2005, the Sheriff's Office had an outstanding warrant for Rodgers on felony drug charges. See Davenport Aff. ¶ 4; Miller Aff. ¶ 4; Hill Aff. ¶ 4. Before his arrest, Rodgers knew that

---

[1] On March 14, 2007, a Beaufort County Superior Court jury convicted Rodgers of possession of cocaine with intent to sell or deliver resulting from the December 21, 2005 arrest and of being a habitual felon. See id. at *1. The jury found Rodgers not guilty of conspiracy to traffic in cocaine by sale, trafficking cocaine by possession, and three separate counts of assault with a deadly weapon on law enforcement officers involving Davenport, Miller, and Captain McLawhorn. Trial Tr. 120:3–122:11. The court sentenced Rodgers to a term of 133 to 169 months' imprisonment. Id. Rodgers appealed his conviction, and the North Carolina Court of Appeals affirmed. Id. at *4. Rodgers is incarcerated at Craven Correctional Institution, and the North Carolina Department of Correction ("DOC") projects his release date as June 30, 2019. See N.C. Dep't of Corr. Offender Pub. Info., http://webapps6.doc.state.nc.us/opi/offendersearch.do?method=view (last visited Aug. 13, 2010).

[2] In 1989, Rodgers pleaded guilty to selling cocaine and served nine years of a thirty-year sentence. Pl.'s Dep. 31:9–25, 33:22–34:3. After being released, Rodgers resumed selling cocaine, and in 2002, pleaded guilty to a drug charge. Id. at 33:4–21. Rodgers received probation. Id. at 33:14. In 2004, Rodgers resumed selling drugs. Id. at 34:18–21.

7

officers were looking for him to execute warrants and had searched his residence. See Trial Tr. 91:22–92:9; Pl.'s Dep. 67:10–68:17.

On December 21, 2005, Lieutenant Davenport and Investigator Richards led an operation to arrest Rodgers. See McLawhorn Aff. ¶ 4. Davenport and Richards have worked for the Beaufort County Sheriff's Office for 13 years. Davenport Aff. ¶ 2; Richards Aff. ¶ 1.[3] Captain McLawhorn and Investigators Hill and Miller assisted and participated in the operation. McLawhorn Aff. ¶¶ 3–4; Hill Aff. ¶ 3; Miller Aff. ¶¶ 2–3. Pitt County narcotics investigator George Shaver ("Shaver") and Farmville Police Detective Paul McLawhorn ("Detective McLawhorn") also assisted with the operation because the operation crossed county lines. See McLawhorn Aff. ¶¶ 5–6.

Defendants occupied unmarked vehicles as they waited for Rodgers to meet Little at Cratch's for a drug transaction. Rodgers pulled his car into Cratch's lot, circled around the building, and parked his car with his headlights facing Highway 264. See, e.g., Pl.'s Dep. 52:11–24; Davenport Aff. ¶ 16. According to defendants, they were parked at different locations, listening to the audio transmission of Rodgers' and Little's conversation, and waiting for Davenport's signal. See Hill Aff. ¶¶ 7–8, Miller Aff. ¶ 8, Richards Aff. ¶ 12. As a "take-down team," the officers planned to box in Rodgers' car. See Richards Aff. ¶ 11; McLawhorn Aff. ¶ 7; Davenport Aff. ¶ 15. Law enforcement officers employ this "safety tactic" to prevent flight, car chases, and accidents. See Davenport Aff. ¶ 15; see Trial Tr. 79:7–11.

As for the arrest, the parties differ on their recollection of certain events leading to Rodgers' arrest. The court views the evidence in the light most favorable to Rodgers. However, in considering Rodgers' motion for summary judgment and viewing the evidence in the light most favorable to

---

[3]In the Richards affidavit, two paragraphs are numbered as one. The cited paragraph refers to the second paragraph numbered as one.

8

Rodgers, the court need not accept the conclusory assertions in his complaint or affidavits about defendants' conduct when the contemporaneous medical records and physical evidence belie plaintiff's assertions. See, e.g., Anderson, 477 U.S. at 252; Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988); May v. Vanlandingham, No. 5:06-CT-3124-D, 2008 WL 2278501, at *5 (E.D.N.C. June 3, 2008) (unpublished), aff'd, 293 Fed. Appx. 983 (4th Cir. 2008) (per curiam) (unpublished). Similarly, the court need not credit Rodgers' assertions in his complaint or affidavits when they contradict his trial testimony about the events of December 21, 2005. Cf. Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990).

Davenport, Miller, and Shaver were in a green Chevrolet Tahoe. Shaver was driving, and he parked the Tahoe in the lot alongside Cratch's. Davenport Aff. ¶ 14; see Miller Aff. ¶ 6. After Davenport signaled, Shaver approached the front of Rodgers' car with his blue lights and siren activated. See Trial Tr. 22:20–22; 73:22–23; 79:16–18; Davenport Aff. ¶ 19. Davenport and Miller exited the vehicle to arrest Rodgers. Davenport Aff. ¶ 19; Miller ¶ 8. From a different road, Captain McLawhorn (who was driving a white Ford 150 and was accompanied by Detective McLawhorn) began to pull in behind Rodgers' car. See McLawhorn Aff. ¶¶ 6–8; Davenport Aff. ¶ 19; Trial Tr. 79:12–19. As McLawhorn approached, he activated the truck's siren, corner strobes, blue lights, and "wig-wags." Trial Tr. 74:4–6, 80:18–81:3; see Trial Tr. 22:22–23; McLawhorn Aff. ¶ 8.

As Davenport and Miller ran toward Rodgers and as Shaver moved in from the front, Rodgers put his car in reverse and began backing up. Davenport ¶ 19; Miller Aff. ¶ 9. Rodgers appeared to be "attempt[ing] to get away." Trial Tr. 74:10–11. Captain McLawhorn, who was approaching from behind, stopped his truck approximately 15 to 20 feet behind Rodgers' car. Trial Tr. 79:12–80:17; see McLawhorn Aff. ¶ 9. However, Rodgers continued in reverse and hit McLawhorn's truck. See McLawhorn Aff. ¶ 9; Trial Tr. 79:19–23, 80:1–17; see also Davenport Aff.

9

¶ 19. Captain McLawhorn and Detective McLawhorn exited their truck. Trial Tr. 79:24–25.

After hitting Captain McLawhorn's truck, Rodgers put his car in drive and moved forward. Davenport Aff. ¶ 20; Miller Aff. ¶ 10; McLawhorn Aff. ¶ 9. Davenport and Miller were on foot in front of Rodgers' car. Miller Aff. ¶ 10. Rodgers struck Miller's right leg. Id. Miller jumped onto the hood of Rodgers' car and slid across to the driver's side to avoid being pinned between Rodgers' and Shaver's cars. Id.; see Trial Tr. 74:2–75:13, 81:15–19. Rodgers' bumper hit Davenport's legs also forcing him onto the hood. Davenport Aff. ¶ 20. Like Miller, Davenport slid across the hood to the driver's side. Id.; see Trial Tr. 75:3–6. Rodgers testified that he did not intend to hit the officers with his car or to slam into the vehicles in front of and behind him. See Trial Tr. 89:15–21.

Davenport and Miller tried to make Rodgers stop his car, but Rodgers pulled around Shaver's car. Id. at 75:7–9, 80:15–17. The driver's window on Rodgers' car was down. Id. at 81:23. Davenport and Miller yelled to Rodgers to turn off the car. Miller Aff. ¶ 11; Trial Tr. 74:23–25. However, Rodgers continued to drive toward Highway 264 and dragged Davenport and Miller for about 20 feet, while they held on and reached inside the window to try to stop the car. See Davenport Aff. ¶¶ 21–22; Miller Aff. ¶ 12; Trial Tr. 23:1–12, 24:1–10, 75:10–13, 81:23–25, 82:1–9. Rodgers knew that Davenport had stuck his hand in the window. See Trial Tr. 88:24–25.

Richards was driving a gray Chevrolet Tahoe, and Hill was his passenger. See Hill Aff.¶¶ 7–8. Richards entered the front of Cratch's parking lot with his blue lights activated. See Richards Aff. ¶ 12; Trial Tr. 42:6–7. When Richards pulled into Cratch's lot, he saw Davenport and Miller hanging from the driver's side of Rodgers' car. Richards Aff. ¶ 13. Richards heard multiple officers yelling at Rodgers to stop the car. Id. Richards then blocked the entrance to Highway 264. Id.; Hill Aff. ¶ 8; McLawhorn Aff. ¶ 11; Miller Aff. ¶ 13; Davenport Aff. ¶ 24; Trial Tr. 51:12–19; 74:23–75:2. Rodgers' car then struck Richards' car. Richards Aff. ¶ 13. Richards and Hill jumped

10

out of the car to assist with the arrest. Richards Aff. ¶ 14; see Trial Tr. 23:11–12. Hill reached in Rodgers' window to "keep him from hitting the gas and taking off." Trial Tr. 82:7–9. When Richards left his car, Rodgers was still behind the steering wheel in his car. Id. at 42:17–21. "Everybody was trying to get the door unlocked and get the door open and get [Rodgers] on the ground, get him secured." Id. at 42:21–23.

Little, who was handcuffed, witnessed the events. See id. at 64:15–66:17. During Rodgers' criminal trial, Little testified that Rodgers "tried to get away." Id. at 64:24–65:2. According to Little's testimony, Rodgers was going "frontwards and backwards" and struck two vehicles. Id. at 65:3–13. Davenport and Miller then tried to remove Rodgers from his car. Id. at 65:14–17. Little also testified that "[a]fter the officers had pulled [Rodgers] out of the car, they got the drugs out of the car." Id. at 66:8–9.

The events surrounding Rodgers' arrest "happened very fast," "unfolded so rapidly," and were "kind of chaotic." McLawhorn Aff. ¶ 11; Richards Aff. ¶ 15; Trial Tr. 64:23, 79:25–80:1. Davenport cannot recall who assisted him in removing Rodgers from the car or who handcuffed Rodgers. Davenport Aff. ¶ 25. Miller indicates that he assisted in removing Rodgers and placing him on the ground. Miller Aff. ¶ 14. Hill states that "[i]t is possible" that he helped to pull Rodgers from the car. Hill Aff. ¶ 9. "[W]ithout question [Rodgers] appeared to be evading arrest." Richards Aff. ¶ 14. "[I]t seemed as though everyone was trying to help get control of the situation," and to "keep[] [Rodgers] from driving off again or otherwise hurting the investigation team." Miller Aff. ¶ 14. "The period of time between when Mr. Rodgers started fleeing and when he was taken out of the car and subdued was only a matter of seconds." Richards Aff. ¶ 16.

The officers "forcefully" pulled Rodgers from the car, Davenport Aff. ¶ 27, but Rodgers "continued to be combative." Hill Aff. ¶ 10. Rodgers resisted putting his hands behind his back.

11

Id. After Rodgers was handcuffed, Davenport searched him. Davenport Aff. ¶ 26. Rodgers was

turned from side to side during the search. Hill Aff. ¶ 11. Hill knelt over Rodgers and held him

down by the shoulders "to control him so that he did not get up or hurt himself." Id. ¶¶ 10–11; see

Davenport ¶ 26. Richards then walked the canine around Rodgers' car, and the dog alerted to the

presence of narcotics. Trial Tr. 43:1–4. Officers took Rodgers into custody. See id. at 43:9–10.

Defendants and Captain McLawhorn deny that any officer kicked or punched Rodgers. See,

e.g., McLawhorn Aff. ¶ 15; Richards Aff. ¶ 17; Hill Aff. ¶ 13; Miller Aff. ¶ 16; Davenport Aff. ¶ 27.

Defendants also deny that any officer uttered racial slurs. See Hill Aff. ¶ 13; Miller Aff. ¶ 16;

Davenport Aff. ¶ 26.[4] Defendants insist that "no abusive contact" occurred between any officer and

Rodgers. Davenport Aff. ¶ 27; see McLawhorn Aff. ¶ 15. In sum, the officers claim that they did

not use excessive force in arresting Rodgers. See McLawhorn Aff. ¶ 15; Hill Aff. ¶ 15; Richards

Aff. ¶ 21.

Defendants also deny that Hill tried to choke Rodgers with a flashlight, inserted a flashlight

or a firearm into his mouth, or threatened to kill him. Hill Aff. ¶ 13; Richards Aff. ¶ 17; Miller Aff.

¶ 16; Davenport Aff. ¶ 26. Moreover, Hill denies that his flashlight or firearm could fit into

Rodgers' mouth. Hill Aff. ¶ 14. Captain McLawhorn agrees. "[D]ue to their size, it is simply not

feasible to ram ["the standard issue gun and flashlight"] into a subject's mouth and down his throat,

and certainly not without damage to the teeth or internal tissue." McLawhorn Aff. ¶ 17.[5]

---

[4]Hill is an African-American, who finds racial slurs "offensive and unprofessional." Hill
Aff. ¶ 13.

[5]Captain McLawhorn attached to his affidavit copies of photographs of a standard issue
flashlight and firearm and ruler to illustrate his point [D.E. 32-1–32-8]. Notably, Rodgers' medical
records contain no reference to complaints of injury to his mouth, throat, or teeth. See Mem. Supp.,
Exs. 1, 2.

12

Furthermore, "proper and safe law enforcement techniques" disapprove of an officer holding a firearm in one hand, while restraining a subject with the other hand. Hill Aff. ¶ 14.

After Rodgers' arrest, defendants observed no signs of injury, including scratches, bruises, or lacerations. McLawhorn Aff. ¶ 16; Richards Aff. ¶ 18; Hill Aff. ¶ 15; Miller Aff. ¶ 15; Davenport Aff. ¶ 28. Rodgers did not complain about being hurt or abused at the scene. Richards Aff. ¶ 18.

Notwithstanding the allegations in his complaint, Rodgers testified at his criminal trial that he "recognized the police, when they drove up." Trial Tr. 88:6–7. Rodgers also testified that he saw a blue light before anyone exited a vehicle. See id. at 89:12–14. Rodgers stated that the officers "bum-rushed" him and pulled out their guns. Id. at 88:7–11. Rodgers recalled: "I was trying to get in the front in the light. They pulled me out of the car, they beat me and kicked me between my legs, and I was trying to get in the light. They was sayin' [sic] to shoot me." Trial Tr. 92:12–15.

Rodgers, who also was on trial for three counts of assault with a deadly weapon on law enforcement officers, did not testify that Hill choked him with the flashlight or pushed it down his throat. Similarly, Rodgers did not testify that Hill placed his gun into his mouth and threatened to fire the weapon and did not testify that the officers used racial insults during his arrest. Moreover, Rodgers did not testify that he offered no resistance and complied with defendants' instructions. Rather, Rodgers' trial testimony describing the officers' use of force corroborates defendants' accounts of the event. Moreover, during the trial, Little did not testify that an officer kicked, punched, threatened, or otherwise physically or verbally abused Rodgers. See Trial Tr. 53:13–71:4.

Rodgers alleges that his "medical records [] prove the injuries that [he has] sustained from the brutal beating [were] very excessive and uncalled for." Compl. 5. Rodgers' medical records, however, tell a very different story. See Mem. Supp., Exs. 1, 2. On December 28, 2005, at his

13

request, Rodgers received a physical examination. Dr. Perkins' typed record states:

> [Rodgers] presents today complaining of some right lower back and buttock discomfort with some pain down to his toes at times. He states that this started after he was pulled out of the car and layed [sic] face down on the pavement last Wednesday when he was arrested. He was not sure if [he] was kicked or poked with anything.

Id. at Ex. 1 (emphases added). A handwritten remark on the same record notes that Rodgers "[t]hinks he was kicked . . . in [right] hip." Id. (emphasis added). The record contains no indication that Rodgers suffered the "brutal beating" described in his complaint and affidavit or was denied medical care. Cf. Compl. 5; Rodgers Aff. Rodgers exhibited "fairly good range of motion in the low back" with "a pulling sensation in the right low back, upper buttock region." Mem. Supp., Ex. 1. Dr. Perkins noted "some tenderness to palpation of the right upper buttock." Id. Dr. Perkins did not identify any scratches, lacerations, bruises, or swelling. As a result of the examination, Dr. Perkins' impression was "[r]ight low back and leg pain, probable sciatica." Id.

About fifteen months passed until Rodgers' next medical visit. Id. at Ex. 1, 2. On March 16, 2007, after his conviction at trial and transfer into DOC custody, Rodgers underwent an initial health screening. Id. at Ex. 2. This screening revealed a "[n]ormal" clinical evaluation of Rodgers' upper and lower extremities and musculoskeletal area. Id. In his self-reported history, Rodgers denied "[b]one, joint or back trouble." Id. Rodgers did not mention to the reviewing physician an alleged use of force event and any resulting injuries. Id. Furthermore, in his March 19, 2007, DOC "Mental Health Screening Inventory Addendum," Rodgers reported that he had never been "[b]eaten" Id.

While in DOC custody, Rodgers received no medical attention from his initial screening until October 7, 2007. Id. On October 7, 2007, Rodgers submitted a sick-call appointment request for a "problem with [his] right side and hip" on and off for approximately two years. Id. On October

14

24, 2007, an x-ray of Rodgers' right hip revealed "modest degenerative changes" in the right hip joint. Id. The radiologist's impression was "[m]odest osteoarthritis of the right hip." Id. Between October 7, 2007, and December 21, 2007, Rodgers requested five sick-call appointments for right hip pain. Id. Rodgers' medical records do not identify any complaints of right hip pain thereafter. Id. The medical records contain no reference to defendants' alleged use of force or the arrest events. Id.

In response to the motion for summary judgment, Rodgers filed an affidavit from his "lady friend" Janice White [D.E. 43]. White states that she accompanied Rodgers to Cratch's, where they waited a "minute or two" for Rodgers to meet someone. Id. "[O]fficial cars rushed at [them] from around the other side of the store" and "blocked [them] in from front, back [and] sides." Id. According to White, officers jumped out of their vehicles and entered their car from the back seat. Id. White claims that an officer beat on her window with a gun drawn, while another began to choke Rodgers from the back. Id. White also states that officers struck Rodgers in the head and back before pulling him from the car. Id. White asserts that the officers dragged Rodgers on the ground and hit and kicked him in the head and sides. Id.

White did not testify at Rodgers' trial. In her affidavit, White does not state that she and Rodgers were unaware that the men were law enforcement officers. Id. White also does not state whether Rodgers' car struck Miller and Davenport and two officers' vehicles. Id. White also does not state whether Rodgers offered resistance to defendants or complied with their instructions. Id. Moreover, White does not claim that Hill pushed a flashlight or firearm down Rodgers' throat. Id.

Rodgers also submitted his affidavit in opposition to the motion for summary judgment [D.E. 43]. Essentially, Rodgers repeats the claims in his complaint. See Rodgers Aff. Rodgers also states that after the arrest, he was bruised and had scratches on his face. Id.

15

## B.

Defendants deny using excessive force and assert the defense of qualified immunity. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Brandon v. Holt, 469 U.S. 464, 472–73 (1985). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Pearson v. Callahan, 129 S. Ct. 808, 815 (2009). Qualified immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005); Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis removed); see Pearson, 129 S. Ct. at 815; Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam).

In evaluating qualified immunity, a court initially may determine whether the plaintiff has alleged or shown a violation of a constitutional right. See Pearson, 129 S. Ct. at 818. If the court determines that no constitutional right was violated, "that ends the matter, and the official is entitled to immunity." Saucier v. Katz, 533 U.S. 194, 199 (2001), overruled on other grounds by Pearson, 129 S. Ct. 808. If the court determines that a constitutional right was violated, the court proceeds to determine if that right was clearly established at the time of the alleged violation. As for the "clearly established right" prong,

the right the official is alleged to have violated . . . must be sufficiently clear that a

16

reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Saucier, 533 U.S. at 202 (citation and quotations omitted); see, e.g., Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009); Miller v. Prince George's County Md., 475 F.3d 621, 626–27 (4th Cir. 2007). The right is defined "at a high level of particularity." Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). In Wilson v. Layne, 141 F.3d 111 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999), the Fourth Circuit held that for a plaintiff to prevail over the defense of qualified immunity, the right at issue must have been "authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." 141 F.3d at 114 (quotation omitted). When the Supreme Court affirmed the Fourth Circuit's decision in Layne, it observed that plaintiffs had not brought to the Court's attention any cases "of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." 526 U.S. at 617.

In most cases, the qualified-immunity analysis does not require factual findings, because the inquiry is a "purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law." Mitchell v. Forsyth, 472 U.S. 511, 528 n.9 (1985). When asserting qualified immunity at the summary judgment stage, however, a defendant may challenge the adequacy of the evidence to support the complaint's allegations. See, e.g., Cloaninger, 555 F.3d at 331.

In an excessive-force case, the first prong of the qualified-immunity analysis focuses on "the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388

17

(1989). "As in other Fourth Amendment contexts . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. "This standard mandates a careful balancing of Fourth Amendment rights against the countervailing governmental interests at stake." Wilson v. Flynn, 429 F.3d 465, 468 (4th Cir. 2005) (quotations omitted); see Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).

Because this objective reasonableness test requires the court to determine the reasonableness of an officer's actions, it is "not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979). Rather, the test "requires careful attention to the facts and circumstances of each particular case." Graham, 490 U.S. at 396. Recognizing that "'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving'—[the court] take[s] care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the '20/20 vision of hindsight.'" Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002) (quoting Graham, 490 U.S. at 396, 397).

In Graham, the Supreme Court recognized several factors to guide the objective-reasonableness analysis in an excessive-force claim. See Graham, 490 U.S. at 396. These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id. "[R]easonableness is determined based on the information possessed by the officer" at the time of the event. Waterman, 393 F.3d at 477.

In this case, the court must evaluate the totality of the circumstances and determine whether the force that defendants used was objectively reasonable under Graham. As mentioned, defendants

18

had an outstanding warrant for Rodgers' arrest on felony drug charges and had secured Little's assistance to reach Rodgers. Indeed, Little and Rodgers had engaged in a felony drug transaction earlier that day, and defendants had probable cause to arrest Rodgers for a serious crime on December 21, 2005. See, e.g., Maryland v. Pringle, 540 U.S. 366, 370 (2003). Rodgers knew Davenport and Richards from a previous arrest on felony drug charges and was aware officers were looking for him. Furthermore, Rodgers saw a "blue light," but used his car to evade arrest. Rodgers' efforts to flee included hitting two deputies with his car and forcing two deputies to jump onto his hood to avoid being pinned between vehicles. Rodgers also struck two Sheriff's cars, one of which blocked his access to escape on the highway. Rodgers repeatedly did not comply with the law enforcement officers' requests to stop his car or communicate his intent to submit to their commands. Through his own active resistance, Rodgers posed a known, immediate threat of physical harm to the law enforcement officers, himself, and the public. After considering defendants' behavior in effecting the arrest and considering the totality of the circumstances, defendants' use of force in subduing and arresting Rodgers was not excessive. See, e.g., Graham, 490 U.S. at 396; Slattery, 939 F.2d at 216.

In reaching this conclusion, the court notes that the Fourth Circuit has held that qualified immunity applies in cases with similar facts, but where the use of force was greater and actually involved the discharge of a firearm. For example, in Drewitt v. Pratt, 999 F.2d 774 (4th Cir. 1993), qualified immunity applied where an officer, after observing the plaintiff driving recklessly, ran toward the vehicle with his gun drawn ordering the plaintiff to stop the vehicle. Id. at 776, 780. Rather than stop, the plaintiff sped up, catching the officer on the hood of the vehicle, at which point the officer fired. Id. at 776. Similarly, in Pittman v. Nelms, 87 F.3d 116 (4th Cir. 1996), the plaintiff was a passenger in a vehicle that was stopped by the police. When two officers approached the

vehicle and began to talk with the driver, the driver attempted to drive away. Id. at 118. One of the officer's arms became entangled inside of the window of the vehicle when the plaintiff attempted to escape, dragging the officer approximately 25 to 30 feet. Id. The other officer shot and struck the plaintiff. Id. The Fourth Circuit held that qualified immunity applied. Id. at 118–20.

In sum, defendants did not violate Rodgers' Fourth Amendment rights when they subdued and arrested him on December 21, 2005. Therefore, defendants are entitled to qualified immunity, and the court grants defendants' motion for summary judgment [D.E. 30].[6]

### III.

Finally, the court considers plaintiff's motion to amend his complaint to add Beaufort County Sheriff Alan Jordan as a defendant [D.E. 46]. Rodgers claims that he inadvertently failed to name Jordan as a defendant. Pl.'s Mot. Amend 2. Defendants contend that the proposed amended complaint is futile and untimely. See Defs.' Resp. Mot. Amend 2–3.

Rodgers seeks leave to amend his complaint to sue Jordan in his individual and official capacities. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation and quotation omitted); see Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004).

---

[6]Rodgers' claim that defendants called him racially-derogatory names does not give rise to a constitutional violation. See, e.g., Harrison v. Prince William County Police Dep't, 640 F. Supp. 2d 688, 706 (E.D. Va. 2009); Morrison v. Martin, 755 F. Supp. 683, 687 (E.D.N.C. 1990), aff'd, No. 90-6134, 1990 WL 174653 (4th Cir. Nov. 13, 1990) (per curiam) (unpublished).

Rodgers pleads no factual allegations against Jordan. A section 1983 plaintiff, however, must allege the personal involvement of a defendant in order to state a claim against that defendant. See, e.g., Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978). Accordingly, Rodgers' proposed amendment fails to state a section 1983 claim against Jordan in his individual capacity and is futile.

Rodgers' proposed claim against Jordan in his official capacity also is futile. Generally, a governmental entity is not liable under section 1983 under the doctrine of respondeat superior. See id. at 694. Liability may attach, however, if conduct directly causing the alleged deprivation is done to effect official policy or custom for which the official is responsible. See, e.g., McMillian v. Monroe County, 520 U.S. 781, 784–85 (1997). Because the court has determined that Rodgers did not sustain a constitutional deprivation during his arrest, any claim against Jordan in his official capacity regarding any official policy or custom of the Beaufort County Sheriff's Office is futile. Accordingly, the court denies plaintiff's motion to amend the complaint [D.E. 46].

Rodgers also appears to assert a claim for deliberate indifference to his medical needs in his affidavit in response to defendants' motion for summary judgment. See Rodgers Aff. "[D]espite the liberal pleading rules outlined by the Supreme Court, [a] plaintiff[] may not raise new claims without amending the[] complaint[] after discovery has begun." Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 Fed. Appx. 556, 563 (4th Cir. 2008) (unpublished); see, e.g., Bostic v. Rodriguez, 667 F. Supp. 2d. 591, 615 (E.D.N.C. 2009). Moreover, "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Barclay White Skanska, Inc., 262 Fed. Appx. at 563 (quotation omitted) (collecting cases). Thus, if Rodgers is seeking to amend the complaint to seek relief under the Eighth Amendment for alleged deliberate indifference, the motion to amend is denied.

21

Alternatively, the court denies each motion to amend because Rogers has failed to show good cause under Rule 16 of the Federal Rules of Civil Procedure to amend the scheduling order. See Fed. R. Civ. P. 16(b)(4); Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298–99 (4th Cir. 2008). On April 30, 2009, the court entered a scheduling order, requiring that "all motions of any nature (except those relating to the admissibility of evidence at trial), must be filed by July 6, 2009" [D.E. 19]. The court informed the parties that "[u]ntimely motions may be summarily disregarded." Id. On June 5, 2009, the court extended the deadline for filing motions to October 5, 2009 [D.E. 23]. On September 29, 2009, the court granted a second request to extend the deadline for filing motions until October 19, 2009 [D.E. 28]. Rodgers failed to file a timely motion with the court seeking leave to add a new party or a new claim. To the extent that Rodgers now attempts to add a new party or a new claim, his attempts are untimely under the scheduling order and good cause does not exist to permit the amendments. See, e.g., Parvizian, 535 F.3d at 298–99. Thus, the court denies Rodgers' proposed amendments.

IV.

As explained above, the court DENIES plaintiff's request to continue defendants' motion for summary judgment or, in the alternative, to enlarge the time to respond [D.E. 48]. The court GRANTS defendants' motion for summary judgment [D.E. 30]. The court DENIES plaintiff's motion to amend the complaint to name Sheriff Jordan as an additional defendant [D.E. 46] and plaintiff's attempt to assert a new claim in his affidavit in response to defendants' motion for summary judgment [D.E. 43]. The Clerk of Court is directed to close the case.

SO ORDERED. This **13** day of August 2010.

JAMES C. DEVER III
United States District Judge

22